# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE SPECTRUM BRANDS, INC. SECURITIES LITIGATION | 1:05-CV-02494-WSD |

## ORDER AND OPINION

This matter is before the Court on Defendants' Spectrum Brands, Inc.

("Spectrum Brands") David A. Jones ("Jones"), and Randall J. Steward

("Steward") (collectively, "Defendants") Motion to Dismiss the Consolidated

Amended Complaint and Memorandum of Law in Support Thereof [21], Plaintiffs'

Memorandum of Law in Opposition to Defendants' Motion to Dismiss [25], and

Defendants' Reply Memorandum of Law in Further Support of Defendants'

Motion to Dismiss the Consolidated Amended Complaint [28].[1]

---

[1] Also before the Court are Defendants' Motion for Leave to File a Supplemental Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss [33] and Plaintiff Edward Webb's Motion to Join Consolidated Action [29]. Having considered the submissions, the Defendants' Motion for Leave to File does not advance any new legal arguments, and only supplements the pleadings previously filed with the Court. No response was filed to these Motions, and under Local Rule 7.1(B) they are considered unopposed. The Motion [33] is therefore GRANTED. Plaintiff Edward Webb's Motion to Join [29] is also GRANTED.

## I.     BACKGROUND

This is a federal securities class action brought against Spectrum Brands and two Spectrum Brands officers.  Plaintiffs assert claims under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, alleging that Spectrum Brands and the individual defendants knew about or recklessly disregarded practices that the Company engaged in during the Class Period that Plaintiffs claim artificially affected the value of Spectrum Brands's stock.  Plaintiffs first filed their complaint on September 26, 2005 [1].  On February 2, 2006, Plaintiffs filed a Consolidated Amended Class Action Complaint [18] ("Complaint"), which is the subject of the present Motion to Dismiss.

### A.     Parties

Lead Plaintiffs James H. Milner, Jain Sushil Kumar, David Davis, and Brett Harris bring these claims on behalf of a putative class of persons who purchased Spectrum Brands's common stock between November 11, 2004, and November 13, 2005 (the "Class Period").  (Compl. ¶ 1.)

Spectrum Brands is a "global, diverse consumer products manufacturing and marketing company." (Id. ¶ 6.)  Spectrum Brands was formerly known as Rayovac. Rayovac's business consisted primarily of the sale of batteries.  (Id. ¶ 7.)  Rayovac

intended to diversify its product line by acquiring lawn and garden product manufacturers, particularly United Industries, Inc. ("United"), and  changed its name to Spectrum Brands.  (Id.)  Batteries, however, remained a core part of Spectrum Brands's business, particularly at the beginning of the Class Period.  (Id.)

Defendant Jones was at all relevant times Chief Executive Officer of Spectrum Brands.  (Id. ¶ 15.)  Defendant Steward served as Spectrum Brands's Chief Financial Officer and Executive Vice President.  (Id. ¶ 16.)

B.      Plaintiffs' Allegations

Plaintiffs claim that Defendants engaged in a practice called "channel-stuffing" involving Spectrum Brand's battery sales business.  Plaintiffs describe the alleged channel-stuffing as a course of conduct in which Defendants "induce customers to purchase larger volumes of [battery] product than ordinarily purchased, even though the customers do not need the larger volume."  (Id. ¶ 17.) According to Plaintiffs, this practice "has the effect of pulling forward into the present quarter orders and revenue that otherwise would be properly placed and recognized in a future quarter."  (Id.)  Plaintiffs allege that Defendants engaged in aggressive channel-stuffing during the fourth quarter of 2004 and the first quarter

of 2005, which allowed Spectrum Brands's performance in the battery market to appear better than it should have and caused an artificial spike in the company's stock price.  (Id. ¶¶ 18-19.)  Plaintiffs claim that Defendants deliberately "mortgaged" future sales to inflate artificially present quarters, in part to facilitate Spectrum Brands's acquisition of United.  (Id. ¶¶ 37-39.)  Spectrum Brands used its own stock as part of the consideration for the acquisition of United.  (Id. ¶ 102.)

Plaintiffs allege that Defendants conducted the channel-stuffing by "accept[ing] returns from retailers to entice them to take additional product with no risk" and by offering unusually deep discounts to facilitate immediate sale, in violation of company policy.  (Id. ¶¶ 40; 45-46.)  Specifically, plaintiffs allege that Defendants violated General Accounting Accountability Principles ("GAAP") when they "sold material quantities of merchandise on a guaranteed sale basis, and improperly recognized these amounts as revenue . . ." in order to inflate Spectrum Brand's sales, and thus its short-term stock price.  (Id. ¶ 42.)

Plaintiffs allege that Defendants violated the Exchange Act by making statements in a series of public filings and comments that fraudulently "fail[ed] to disclose the pervasive nature of the [channel-stuffing] practice and the effect it

would have on future sales and earnings" and fraudulently assured investors that "future sales would be robust."  (Id. ¶¶ 23; 21.)

      1.    *Channel-stuffing*

Plaintiffs allege that Defendants' statements of strong battery sales growth and positive earnings guidances were misleading because Defendants concealed that battery sales reported during the Class Period were generated at the expense of sales in future quarters.  (Id. ¶¶ 18-19.)  Plaintiffs claim that customers such as Wal-Mart were given deep discounts, flexible payment terms, and other incentives to purchase inventory even when already overstocked with batteries.  (Id. ¶ 20.)  Plaintiffs assert that incentives were created to accelerate sales so as to inflate the amount of inventory moved in present quarters.  (Id. ¶ 20.)  Although channel-stuffing "is not fraudulent per se" Garfield v. NDS Health Corp, — F.3d —, 2006 WL 288238, *3 (11th Cir., October 12, 2006), Plaintiffs allege that senior management in Spectrum Brands engaged in it with intent to inflate artificially Spectrum Brands's stock price during the Class Period.  Plaintiffs allege that Spectrum Brands's financial reporting and other public statements were fraudulent because Defendants knew when the statements were made that, due to the alleged channel-stuffing, Spectrum Brands's sales figures were misleading.  (Id.)

Plaintiffs allege the Exchange Act was violated because Defendants, "failed to disclose: (1) an adverse sales trend had emerged in the Company's core battery business; and (2) that Defendants had intentionally concealed the adverse trend in the Company's core battery business by engaging in channel-stuffing." (Compl. ¶¶ 61, 63, 67, 71.)  Plaintiffs allege the following statements to be misleading:

a. *The November 10, 2004 Press Release*

On the evening of November 10, 2004, Spectrum Brands (then still named Rayovac) issued a press release titled "Rayovac Announced Record Fourth Quarter and Fiscal 2004 Results."  The press release read, in relevant part:

> Rayovac Corporation announced fiscal 2004 fourth quarter diluted earnings per share of 52 cents and pro forma diluted earnings per share of 60 cents, two cents higher than First Call mean estimates.  These results compare to diluted earnings per share of 39 cents and pro forma diluted earning per share of 49 cents for the comparable prior year period.
>
> "Fiscal 2004 has been a year of tremendous progress for Rayovac, as our strong fourth quarter results clearly demonstrate," said Dave Jones, chairman and CEO.  "We saw solid twelve percent sales growth in our global battery business" and very strong eighteen percent top line growth from Remington . . . . The integration of the Remington acquisition is complete and the resulting synergies will meet our target of approximately $35 million.  The cash flow we generated during fiscal 2004

has allowed us to invest in high return areas of our business while lowering debt levels significantly.  These accomplishments should position Rayovac for another successful year in fiscal 2005. . . .

The Company is releasing its expectations for fiscal year 2005 diluted earnings per share to a range of $2.10 to $2.15.  This represents an increase of approximately fifteen to seventeen percent over fiscal 2004 pro forma results.  Fiscal 2005 net sales are expected to approximate $1.5 billion.

(Compl. ¶ 60.)

### b.  *The November 11, 2004 Analyst Teleconference*

Individual Defendants Steward and Jones participated in an earnings conference call with analysts the day following the press release.  Plaintiffs claim that the following misleading statements were made during that conference:

As we go through our discussion of Q4 results, there's four primary areas I'd like to highlight that have been the major drivers behind our accomplishments, both for the quarter and the year.  The first is organic growth. . . .

Rayovac's global battery sales growth for the quarter was 12%, reflecting the strength in momentum in our . . . brands. . . .

We have a very good quarter overall in our North American battery business, with 14% overall growth driven by very strong 16% growth in alkaline batteries.

> Excluding hurricane-related sales, battery revenue was up
> 6%, reflecting the continued strong momentum in our
> "50% More" marketing strategy.  Our alkaline battery
> market share increased approximately one point during
> the quarter as compared to last year.

(Compl. ¶ 62.)

> c. *The January 27, 2005 Press Release and February 11, 2005*
> *10-Q  Filing*

Spectrum Brands (still then called Rayovac) released a press release on

January 27, 2005 titled "Record First Quarter Results."  Plaintiffs claim that release

stated:

> Rayovac Corporation announced fiscal 2005 first quarter
> diluted earnings per share of 79 cents, which include a
> one cent gain from the disposal of fixed assets, compared
> with diluted earning per share of 67 cents for the
> comparable period last year.  First quarter 2005 pro
> forma diluted earnings per share of 78 cents were 20
> percent higher than the 2004 first quarter pro forma
> diluted earnings per share of 65 cents, and three cents
> higher than analyst's mean estimates as reported by First
> Call. . . .
>
> Rayovac Chairman and CEO David Jones commented
> that "Rayovac delivered solid sales growth and double-
> digit earnings growth in our first fiscal quarter.  Our
> worldwide battery business generated a strong sales
> increase of twelve percent.  Global sales of Remington
> products improved modestly, with a very strong
> performance in Europe/Rest of World somewhat offset

by lower sales in North America resulting from a challenging retail environment.  We continue to make significant progress in the integration of our Microlite and Ningbo Baowang acquisitions, and we are pleased to announce that our Brazilian business (formerly Microlite) contributed positive operating earnings in the first quarter, two quarters ahead of our original expectations. With a 20 percent pro forma diluted EPS growth rate for the fiscal first quarter, Rayovac continues to deliver exceptional performance." . . .

North American battery sales showed modest growth of two percent. . . .

The Company is raising expectations for fiscal year 2005 diluted earnings per share to a range of $2.15 to $2.20. Fiscal 2005 net sales expectations are unchanged at approximately $1.5 billion.  This guidance does not include the impact of the pending United Industries acquisition.  Financial guidance incorporating the impact of this acquisition will be provided subsequent to the anticipated closing of that transaction in February.

(Compl. ¶ 66.)

Plaintiffs allege that these results "were restated in the Company's Form 10-Q filed with the SEC on February 11, 2005."  (Compl. ¶ 68.)

d. *The May 4, 2005 Press Release and May 13, 2005 10-Q*

Plaintiffs claim that Spectrum Brands "announced" the following statements,

presumably in a press release, and then repeated their substance in an SEC filing a

little more than a week later:

> Spectrum Brands . . . announced a fiscal 2005 second
> quarter fully diluted loss per share of four cents,
> compared with diluted earnings per share of eight cents
> for the comparable period last year.  Second quarter 2005
> pro forma diluted earnings per share were 51 cents, a 168
> percent improvement compared with 2004 second quarter
> pro forma diluted earnings per share of 19 cents, and one
> cent higher than analysts' mean estimates as reported by
> First Call. . . .
>
> "We are off to an excellent start in our first quarter
> reportings as Spectrum Brands," said Dave Jones,
> Chairman and Chief Executive Officer.  "Net sales
> showed strong growth of nine percent when compared to
> 2004 results adjusted to include United Industries.  When
> compared to the same quarter last year, worldwide
> battery sales grew eleven percent and global sales of
> Remington branded products showed an improvement of
> ten percent.  The lawn and garden, household insect
> control and pet supplies businesses we acquired with the
> United acquisition in February generated strong sales
> growth of seven percent versus their comparable
> standalone 2004 results.  Spectrum Brands is continuing
> to deliver on our strategy of delivering industry-leading
> earnings growth. . . ."

> Spectrum Brands management is raising its earnings
> guidance for fiscal year 2005 diluted earnings per share
> to a range of $2.40 to $2.50.  Fiscal 2005 net sales are
> projected at approximately $2.4 billion.

(Compl. ¶ 70.)

### 2.    Improper Returns and Revenue Recognition

Plaintiffs allege that Spectrum Brands permitted some customers,

particularly Wal-Mart, to return any product that they failed to sell, but did not

disclose this practice in its statement of Spectrum Brands's revenue recognition

policy, rendering earnings statements and predictions misleading.  (Compl. ¶ 37.)

Plaintiffs claim that "Defendants knew that the Company regularly accepted

returns of batteries from its customers, including Wal-Mart, its largest customer."

(Compl. ¶ 65.)

Plaintiffs claim that Spectrum Brands filed a 10-K on December 14, 2004

and a 10-Q on February 11, 2005, falsely stating Spectrum Brands's revenue

recognition policy.  Those filings read, in relevant part:

> We recognize revenue from product sales upon shipment
> to the customer, which is the point at which all risks and
> rewards of ownership of the product are passed, provided
> that: there are no uncertainties regarding customer
> acceptance; persuasive evidence of an arrangement
> exists; the price to the buyer is fixed or determinable; and

> collectibility is deemed reasonably assured.  We are generally not obligated to allow for, and our general policy is not to accept, product returns for battery sales. We do accept returns related to our shaving, grooming, and personal care products.  We estimate and accrue the cost of these returns based on historical experience, which are treated as a reduction of net sales.

(Compl. ¶¶ 64, 68.)

      C.    <u>Alleged Violations Of Securities Laws</u>

Plaintiffs assert two counts based on the Defendants' alleged misconduct.  In Count I, Plaintiff seeks damages under Section 10(b) of the Exchange Act and Rule 10(b)(5) of the Securities Exchange Commission.  Count I is asserted against all Defendants for alleged false and misleading statements regarding the strength of Spectrum Brands's battery sales and its positive outlook for future sales, and for false and misleading statements stating Spectrum Brands's return and revenue recognition policies.  In Count II, Plaintiffs seek damages against the Individual Defendants under Section 20(a) of the Exchange Act on the grounds they are "control persons" of Spectrum Brands and thus liable for the alleged violations of Count I.

## II.    STANDARD OF REVIEW

### A.    Standard Of Review For Motion To Dismiss

A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). On a motion to dismiss, the allegations contained in the complaint must be accepted as true and the facts and all inferences must be construed in the light most favorable to the plaintiffs. See Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998); Cooper v. Pate, 378 U.S. 546, 546 (1964); Conner v. Tate, 130 F. Supp. 2d 1370, 1373 (N.D. Ga. 2001). Plaintiff must not simply make bare assertions of legal conclusions. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

### B.    Standard Of Review For Federal Securities Fraud Case

#### 1.    *Expanded Evidence Considered*

When considering a motion to dismiss in a securities fraud case, the Court may take judicial notice of the contents of relevant public documents that were

required to be filed with the Securities Exchange Commission ("SEC") and were actually filed.  See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999).  The Court may also consider evidence outside the pleadings that is undisputedly authentic and on which plaintiffs specifically relied in the complaint. Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999).  Moreover, if "a complaint fails to plead facts that, if true, would constitute a misrepresentation, and does nothing more than offer the legal conclusion that a representation was somehow misleading, dismissal of plaintiffs' claims is appropriate."  In re Friedman's, Inc. Sec. Litig., 385 F. Supp.2d. 1345, 1358 (N.D. Ga. 2005).

A misrepresentation is "material" if "there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the investor as having "significantly altered the total mix of information made available."  Id. at 1359 (quotation omitted).  In other words, "a misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important to an investment decision."  Id.

2.      *Heightened Pleading Requirements*

Allegations of securities fraud must satisfy the requirements of Federal Rule

of Civil Procedure 9(b), which requires pleading with particularity.  Although Rule

9(b) speaks to fraud generally, there is no question that its particularity

requirements apply to claims under Section 10(b) and Rule 10b-5.  See, e.g., In re

Towne Servs. Inc. Sec. Litig., 184 F. Supp. 2d 1308, 1316 (N.D. Ga. 2001).  Rule

9(b) requires plaintiffs to plead "such matters as the time, place and contents of

false representations, as well as the identity of the person making the

misrepresentation[2] and what was obtained or given up thereby . . . .  [C]onclusory

allegations that a defendants' conduct was fraudulent and deceptive are not

---

[2] Defendants do not contend that Plaintiffs' claims should be dismissed
because Plaintiffs fail to attribute particular statements to particular individuals.
Plaintiffs apparently rely on the group pleading doctrine to plead that certain
statements conveyed in the company's releases are the collective actions of the
Individual Defendants.  The Eleventh Circuit has not definitively ruled on the
continuing viability of the group pleading doctrine after the enactment of the
PSLRA.  The Court finds that the doctrine necessarily applies and Plaintiffs have
pleaded claims against the Individual Defendants.  See, e.g., In re AFC Enters., Inc.
Sec. Litig., 348 F. Supp. 2d at 1371 (finding group pleading doctrine remains
viable in appropriate circumstances).  Application of the doctrine is particularly
fair and appropriate in this case in which the alleged misrepresentations are
contained in releases in which the Individual Defendants - as Chief Executive
Officer and Chief Financial Officer- were necessarily involved and under whose
authority they were issued.

sufficient to satisfy the rule." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir. 1997) (dismissing complaint because plaintiffs' allegation of fraud "is simply not particularized") (quotation omitted).  Rule 9(b) requires plaintiffs in a securities fraud case to specify the who, what, where, when, why and how of the alleged fraud.  See In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d 1348, 1353 (N.D. Ga. 2000).  The factual circumstances of the alleged fraudulent statements must be pled with specificity.  See Garfield v. NDCHealth Corp, — F.3d at —, 2006 WL 2883238, **3-4 (11th Cir., October 12, 2006).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, imposes additional pleading requirements for plaintiffs in securities fraud cases. First, the PSLRA requires a plaintiff to:  (i) specify each statement or omission alleged to be misleading; (ii) the reason why the statement or omission is misleading; and, (iii) the facts surrounding the alleged misrepresentation.  15 U.S.C. § 78u-4(b)(1).  Second, the PSLRA requires a plaintiff, "with respect to each act or omission . . . [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Put another way, the PSLRA requires more than the alleging of a reasonable hypothesis of fraud.  It requires specific facts to show a fraud occurred

through particular statements or omissions made with the intent to mislead. <u>See</u>, e.g., <u>NDCHealth Corp.</u>, 2006 WL 2883238 at *3 ("[C]hannel-stuffing may amount to fraudulent conduct when it is done to mislead investors. . . .").

If the plaintiff does not satisfy the PSLRA's pleading requirements, the Court must dismiss the complaint.  <u>See</u> 15 U.S.C. § 78u-4(b)(3)(A).

C.    <u>Elements Of Plaintiffs' Claims</u>

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, mandates that no person shall "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b).  Rule 10b-5 implements and clarifies §10(b) by specifying the types of behavior forbidden:

> (a) To employ any device, scheme or artifice to defraud;
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

-17-

17 C.F.R. § 240.10b-5 (1995).

The Eleventh Circuit construes §10(b) and its implementing rule to require the demonstration of: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter or intent to defraud; (4) upon which plaintiff relied; and (5) that proximately caused plaintiffs' injury.  Bryant, 187 F.3d at 1281. Regarding the scienter element, the Eleventh Circuit has found that "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner."  Id. at 1287. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  Theoharous v. Fong, 256 F.3d 1219, 1224-25 (11th Cir. 2001) (quotations and citations omitted).

Section 20(a) provides liability for a "controlling person" where an Exchange Act violation is found.  15 U.S.C. § 78t(a).  To show control person liability under Section 20(a), a plaintiff must allege that: (1) the company violated

-18-

§ 10(b); (2) the defendant had the power to control the general affairs of the company; and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation.  See Theoharous, 256 F.3d at 1227.  A defendant is not liable as a control person under § 20(a) unless a primary violation of the securities laws is proved.  Id.

## III.   DISCUSSION

Plaintiffs' Complaint sets forth, at most, a hypothesis that Defendants engaged in channel-stuffing to inflate artificially short-term quarterly sales revenue, thus boosting temporarily Spectrum Brands's stock price, for the primary purpose of facilitating Spectrum Brands's acquisition of United Industries and other companies.  Plaintiffs present a number of generalized conclusory allegations, supplement them with a few averments of specific fact, and, from that mix, offer their conclusion that securities fraud occurred.  The PSLRA, however, requires more than a reasonable hypothesis drawn mostly from general observations.  The PSLRA requires Plaintiffs, at a minimum, to plead specific facts: (i) describing the statements alleged to be materially misleading, (ii) showing why the statements alleged are misleading; (iii) describing the circumstances of the allegedly misleading statements; and (iv) giving rise to a strong inference of

scienter as to the Defendants.  The Complaint does not meet this standard.  Even if the Plaintiffs' general observations and conclusions appear facially reasonable,  as the Court will discuss below, Plaintiffs failed to plead their case with the particularity demanded by the statute governing this action.

      A.     <u>Defendants' Motion to Dismiss</u>

Defendants move to dismiss the Complaint on four grounds.  First, Defendants claim that Plaintiffs have failed to allege with sufficient particularity the facts underlying their fraud claims–namely the facts surrounding the channel-stuffing and return policy allegations.  Second, Defendants contend that Plaintiffs have failed to allege facts sufficient to give rise to a strong inference of scienter. Third, Defendants contend that the statements alleged by Plaintiffs to be fraudulent are protected by multiple safe-harbor provisions of the PSLRA.  Fourth, Defendants argue that because Plaintiffs cannot establish a primary violation of the Exchange Act, Plaintiffs' control person claims under § 20 fail.

The Court, having reviewed carefully the arguments and authorities presented by the parties, concludes that the Complaint does not meet the particularity requirements of the PSLRA and Federal Rule of Civil Procedure 9(b), that the Complaint does not sufficiently allege scienter, and that Plaintiffs

securities fraud claims and the § 20 control person claims that depend on them therefore must be dismissed.

The Court dealt with a securities fraud claim predicated on channel-stuffing in <u>Garfield v. NDCHealth Corp.</u>, No. 04-00970-CV-WSD-1 (N.D. Ga., July 27, 2005). In that case, both this Court and the Eleventh Circuit held that a securities fraud complaint founded on channel-stuffing that failed to describe the context of the channel-stuffing with sufficient particularity failed to meet the requirements of the PSLRA. <u>Id.</u>; <u>NDCHealth Corp.</u>, 2006 WL 2883238 at **3-4. Because the present Complaint does not provide materially greater particularity regarding the context of the alleged channel-stuffing than the complaint in <u>NDCHealth</u>, the Complaint in this case is necessarily inadequate.[3]

---

[3] A careful reading of <u>NDCHealth</u> reveals that the Complaint at issue in that case was pled with somewhat more specificity than that at issue here. If the more particular pleading in <u>NDCHealth</u> was insufficient to satisfy the PSLRA, then the less particular pleading presented here must also be insufficient.

1.    *Particularity*

The PSLRA requires Plaintiffs to: (i) identify the specific statements or omissions alleged to be misleading; (ii) articulate the reasons why each statement or omission was misleading; and (iii) identify the time, place and context of each allegedly misleading statement.  See In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d at 1353.  Plaintiff's allegations fail to satisfy these heightened pleading requirements.

Plaintiffs have alleged that Defendants engaged in channel-stuffing in general terms.  Generally, Plaintiffs claim that Defendants moved into current financial quarters sales that would have been made in later quarters absent the unusual incentives offered by Defendants.  Plaintiffs then generally allege that in doing so, and filing financial reports and making public statements documenting the company's inflated performance as if it were normal, Defendants mislead the public in two ways.  First, Plaintiffs allege that the public was mislead regarding the strength of Spectrum Brands's sales performance and growth.  Second, Plaintiffs allege that the public was mislead regarding Spectrum Brands's revenue recognition and return policies, particularly that Spectrum Brands recognized as "sales" products that it in fact anticipated would be returned contrary to company

policy.  While Plaintiffs may have identified adequately specific statements alleged to be misleading, and have generally described the conduct which they allege render those statements actionably misleading, they have not alleged sufficiently the circumstances of the conduct to show why each statement or omission was misleading.  NDC Health Corp., 2006 WL 2883238 at *3 (holding that a 10b claim requires a sufficient level of factual support meaning circumstances of the fraud must be pled in detail).

Specifically, Plaintiffs fail to identify sufficiently facts showing the nature of the channel-stuffing, return policy, and revenue-recognition conduct they allege rendered Defendants filings and public statements misleading.  The actual facts Plaintiffs allege are few, and those asserted do not flesh out the claims advanced. For example, Plaintiffs rely significantly on their general allegations that Defendants followed liberal and aggressive return practices contrary to company policy as part of a scheme to inflate artificially Spectrum Brands's stock price, but Plaintiffs do not allege by more than implication that any specific improper returns actually occurred.

a.    Channel-stuffing

Plaintiffs claim that Defendants' statements regarding battery sales were false or misleading because Defendants knew, but failed to disclose, that Spectrum Brands had undermined future quarters by inflating artificially present quarters through the practice of "channel-stuffing." (Compl. ¶ 20.)  Although channel-stuffing is not "fraudulent per se," the practice of "providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health" is not permissible.  NDCHealth Corp., 2006 WL 2883238 at *3.  See also Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 598 (7th Cir. 2006).  Plaintiffs allege that Defendants' channel-stuffing was fraudulent because: (i) it concealed the adverse battery sales trend that Spectrum Brands would have otherwise experienced; and (ii) it provided the basis for Defendants to make optimistic, but untrue, public statements about Spectrum Brands's present and future financial performance.  (Id. ¶ 21.)  Defendants contend that Plaintiffs' have not pled the channel-stuffing with sufficient particularity, and thus that Plaintiffs' allegations must be dismissed.  (Id. at ¶¶ 8-14.)

Plaintiffs' channel-stuffing allegations comprise the central circumstance of Plaintiffs' fraud claims, and they must meet the heightened pleading requirements

of the PLSRA.  See, e.g., NDCHealth Corp., 2006 WL 2883238 at *3 ("channel-stuffing may amount to fraudulent conduct when it is done to mislead investors, but the allegations of channel-stuffing in the instant case were not pled with sufficient detail. . . .").  Because channel-stuffing is not fraudulent per se, the requirement that Plaintiffs plead this circumstance with particularity if they choose to assert it as a basis of fraud is particularly compelling.  Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999) ("There is nothing inherently improper in pressing for sales to be made earlier than in the normal course, and we do not understand plaintiffs' complaint to make any such claim.").  Although channel-stuffing is not in itself fraudulent, it can facilitate fraud if it is used for "providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health . . ." Makor Issues & Rights, Ltd., 437 F.3d at 598.  To prove the context of the alleged fraud, Plaintiffs must plead with particularity facts sufficient to allege not only that the alleged channel-stuffing occurred, but also that it was not legitimate.  Such facts are absent from the Complaint.

Plaintiffs' channel-stuffing allegations consist only of generalized assertions regarding Defendants' corporate culture and business practices.   Plaintiffs fail to

identify any specific transactions or communications to support their conclusory

channel-stuffing based claims.  The following examples illustrate the generic

nature of Plaintiffs' contentions:

- "To induce SPC's customers, including Best Buy, Menards, Wal-Mart, Kmart, Shopco, and Toys R Us, to order unwanted product and to pull sales forward into earlier quarters, SPC gave its customers deeper discounts, longer payment terms, and credits towards future purchases. The highest levels of management at SPC engaged in this channel-stuffing."

(Compl. ¶ 20).

Missing here, for example, is any particular fact allegation regarding which of

Spectrum Brands's clients ordered additional batteries in response to the alleged

incentives, when ordered, when delivered, what quantities, and in response to

which incentives.

- According to a former national account manager, K-mart stores had on average between 52 to 100 weeks of Rayovac batteries, with some stores holding 250 weeks of C and D batteries. This same witness stated that Wal-Mart had 30-50 weeks of product in inventory and even though everyone knew in January 2005 that Wal-Mart's inventory levels and weeks on hand were way up, SPC continued to offer Wal-Mart incentives to take additional product because "we needed to make the numbers."  Wal-Mart's inflated inventory was confirmed by a former sales analyst, employed at SPC during the Class Period, who recalled at least "30 weeks on hand" and stated, "We all knew what was going on, we front loaded the stores in August and September 2004 for the Christmas holiday." This witness reiterated that executive-level management handled every aspect of the Wal-Mart account because the Company was so dependent on this relationship."

(Id. ¶ 34).

Plaintiffs' allegations as to Wal-Mart and K-Mart state that those stores had

multiple weeks of battery inventory their shelves, but Plaintiffs fail to allege facts

to show that this level of inventory was unusually high for that time of year, what

special incentives, if any, were offered to the customers, that Wal-Mart or K-Mart

accepted the incentives or bought additional batteries in response thereto, or to

show any of the other circumstances of the transaction.

- "In another instance during September 2004, a former Channel Manager recalled offering ShopCo an additional 30 days onto the standard payment terms 'because they weren't ready to take their Christmas inventory yet.' Rather than wait and ship the batteries under normal terms when the customer wanted them, the Company enticed the customer with promotional terms and discounts so that future quarter's revenue could be pulled back into the current quarter."

(Id. ¶ 35).

Although this example identifies the time, the customer, and the alleged incentive

offered, it does not assert facts to show that ShopCo accepted the offered incentive

or responded to it by purchasing more product, when such purchases were made, in

what amounts, whether ShopCo had an unusually high level of existing inventory

in the first place, or any other of the circumstances of the alleged transaction.  On

its face, this allegation reveals legitimate marketing and incentive practices engaged in by most companies.

These examples, which are representative of all the allegations of the Complaint, confirm that Plaintiffs' allegations are not sufficiently particular in the facts of the alleged channel-stuffing, specifically allegations that the channel-stuffing was engaged in for an improper purpose, and thus fail to plead the circumstances of the alleged fraud. Plaintiffs' allegations of channel-stuffing at most aver generally that Spectrum Brands's largest customers acquired substantial battery inventories in their respective stores during the Class Period. Plaintiffs do not allege any specific instances where a particular customer with a high inventory of batteries actually purchased more batteries at the end of a quarter in response to special incentives or pressure from Spectrum Brands. Plaintiffs do not allege facts to show that the amount of batteries that Spectrum Brands's customers carried in inventory during the Class Period was unusual, how often it allegedly occurred, or that unusually high inventory was caused by Spectrum Brand's sales tactics. Plaintiffs do not allege that incentives offered to customers like ShopCo resulted in the sale of more batteries, nor do they allege that the offered incentives were accepted. Plaintiffs do not allege facts sufficient to show whether the alleged

channel-stuffing practices were widespread or anecdotal, whether they involved hundreds rather than millions of dollars worth of product, or how the alleged channel-stuffing transactions at the end of the quarters differed from sales made at other times during the quarter.  Without this particularity, Plaintiffs have pled insufficient context for the representations and omissions alleged.

Plaintiffs, in essence, ask the Court to make unwarranted deductions regarding the channel-stuffing allegations.  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  <u>Oxford Asset Mgmt., Ltd.</u>, 297 F.3d at 1188.  With regard to the claims as to Wal-Mart and K-Mart, Plaintiffs ask the Court to infer that the levels of battery inventory were the result of a deliberate course of conduct by Spectrum Brands, that Spectrum Brands offered unusual incentives to Wal-Mart and K-Mart at the end of the quarter different from incentives offered at other times, and that the incentives alleged to be offered resulted in additional sales.

The PSLRA and Rule 9(b) prohibit Plaintiffs avoiding dismissal at the pleading stage where their complaint requires facts necessary to support the allegations to be inferred.  The Complaint here invites speculation and conjecture, precisely that which the PSLRA seeks to avoid.  Plaintiffs' allegations of channel-

stuffing fail adequately to describe the who, what, where, when and how of the channel-stuffing claims.  See In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d 1348, 1353 (N.D.Ga. 2000).  To reach the conclusions advocated by Plaintiffs, the Court must speculate and make deductions of fact regarding the alleged channel-stuffing to fill in the gaps of the circumstances of the alleged fraud described by the vague allegations of the Complaint.  Plaintiffs have thus failed to plead the context of the fraud alleged with sufficient particularity.

b.    Improper Returns and Revenue Recognition

Plaintiffs also claim Defendants engaged in improper revenue recognition by granting exchange and return rights to customers in violation of company policy, and by recognizing revenue when the product was shipped but collectibility of the sales proceeds not yet reasonably assured.  (Compl. ¶¶ 40-43.)  Plaintiffs contend that these exchange and return practices violated several GAAP principles, assisted the channel-stuffing scheme, inflated artificially the Company's earnings, and caused Defendants' financial reporting throughout the Class Period to be materially false and misleading.  (Id.)

Plaintiffs allege further that Defendants return practices contributed to the fraud alleged.  Plaintiffs assert that Spectrum Brands had an "unofficial" return

policy in violation of company policy that allowed it to ship and count as revenue product that was anticipated to be returned by the customer.  (Compl. ¶ 43.) Plaintiffs allege that Defendants violated GAAP principles by booking sales as revenue when Spectrum Brands's liberal return practices caused it to retain the risk of the product not being sold to an end consumer, and that, coupled with Defendants' alleged channel-stuffing, increased the risk that the shipped products would not be sold, but rather returned to Spectrum Brands. (Id.)  Plaintiffs allege that these return and revenue recognition practices caused Defendants' revenue recognition statements to be misleading.

Defendants argue Plaintiff has failed to identify with sufficient particularity specific alleged returns or other revenue recognition events to establish the circumstances of the claimed fraud.  (Def. Mot. to Dismiss at 14-15.)  Because the alleged improper return and revenue recognition practices form part of the circumstances of the fraud alleged by the Plaintiffs, those facts must be pled with particularity.  Plaintiffs' Complaint fails to meet this burden.

Plaintiffs assert broad, vague attacks against Spectrum Brands's alleged business practices, but again fail to allege particular factual allegations sufficient to show how Spectrum Brand's return or revenue recognition practices constitute

circumstances of the alleged fraud.  Plaintiffs do not identify specific returns or

incidents of improper revenue recognition with particularity sufficient to satisfy the

PSLRA.  Indeed, a careful review of the Complaint reveals not even one allegation

of a specific return consummated in violation of company policy or one specific

improper revenue recognition event.  The following examples are illustrative:

- "Another tactic employed as part of Defendants' scheme to inflate
  revenues during the 4Q2004 and 1Q2005 involved shipping goods,
  which was a revenue recognition event on the day they shipped,
  regardless of whether the customer wanted the goods yet. This has the
  same effect of pulling future revenue into the current quarter."

(Compl. ¶ 36.)

Missing here are any facts to show a specific event of improper revenue

recognition, including the customer to which the product was shipped, that the

customer did not want the goods (or that Spectrum Brands otherwise retained the

risk of loss), and that the sale was recognized as revenue by Spectrum Brands

before the risk of loss transferred.

- "A former customer service supervisor, employed during the Class
  Period, relayed the following story as being indicative of the types of
  activity the Company engaged in at management's direction during
  the 4Q2004 to meet projected sales targets. On the last day of the
  4Q2004, a large tractor trailer truck full of batteries was shipped
  prematurely to a retail customer, only to let it sit in that customer's
  parking lot for three days because they refused to accept the product

which had been delivered early. SPC recorded this revenue in the
4Q2004 because it "shipped" within the quarter, but management
knew the customer would not accept the product at that time since
delivery terms had not been established for that time. Defendants'
practice of shipping goods earlier than a customer had requested in
order to meet quarterly goals caused the product to either be shipped
back to SPC, or caused significant penalties to SPC for violation of
the agreed upon delivery terms. For example, a former supervisor of
Customer Care explained that larger customers, such as Wal-Mart and
Menards, would charge the Company for storage space in their
warehouse if goods were shipped early. Walmart, in particular, would
simply deduct the amount it charged in storage fees for goods
prematurely delivered from its payment to the Company for the total
shipment. Another witness told a similar story, but in a prior period,
where SPC sent five tractor trailer trucks to a customer on the last day
of the quarter, only to have them returned full a week later after the
customer refused the product.  According to this witness, these returns
would be recorded in the quarter following the one in which the
revenue had been improperly recorded. These are both examples of
what a former Director of Marketing concluded was simply SPC
"mortgaging its future to meet monthly and quarterly goals." These
extraordinary "shipping" procedures were necessary to artificially
boost sales and did not reflect ordinary, sustainable demand for SPC
products."

(Id. ¶ 37.)

Missing here, again, are the who, why, and how required by the PSLRA, leaving

only a lengthy, vague, and conclusory allegation that fails to identify customers in

the one instance where it alleges a specific date and transaction, and, conversely,

fails to identify any specific transactions or dates where it identifies customers.

This example does not even allege that its vague references to early battery

shipments to Wal-Mart (for example) describe deliberate channel-stuffing efforts

rather than honest delivery mistakes, nor does the allegation provide an estimate of

the frequency of these early shipments from which a lack of inadvertence could be

inferred.

> • " For example, according to a former sales analyst for the Company
> during the class period, from September 2004 through January 2005,
> the Company ran a pallet promotion where they sent ¼ or ½ size
> pallets as promotional tools. The goal was to place 5 pallets per store
> location. The program helped the Company move a lot of additional
> inventory, but in January 2005, Wal-Mart requested the return of $5
> million worth of batteries.  This witness stated that only Defendant
> Steward or Defendant Jones could authorize a return of this
> magnitude. Accepting returns was contrary to Defendants' publicly
> stated policy of not accepting returns, and also violated GAAP."

(Id. ¶ 39.)

Missing here is any allegation that the alleged $5 million return actually occurred.

The mere allegation that Wal-Mart requested such a return, in the absence of a

further allegation that the return was accepted, adds nothing to the Complaint.

> • "In contravention of GAAP, SPC sold material quantities of
> merchandise on a guaranteed sales basis, and improperly recognized
> these amounts as revenue because (i) in all instances the amount of
> future returns could not be reasonably estimated by SPC; and (ii) in
> connection with the "sham" shipments, the buyer had no obligation to
> SPC in the event of theft or physical destruction or damage of the
> product."

(<u>Id.</u> ¶ 42).

Missing here, again, are allegations of any specific return transaction or revenue

recognition event.

- "To make matters worse, the Company instituted another marketing strategy change near the end of the Class Period shifting away from the "50% more" six packs to "Same Performance, Better Value" four-packs designed to compete directly with Duracell's and Energizer's more expensive four-packs. Once again, product returns and unusual promotions were necessary to move packaged products from the stuffed retail channel."

(<u>Id.</u> ¶ 50).

Missing here are allegations of any specific returns accepted by Spectrum Brands

or improper revenue recognition events. The allegations offer a hypothesis

unsupported by sufficient confirming facts.

      The absence of particularity in these allegations is evident. Focusing on the

only two of Plaintiffs' allegations which convey any detail at all, the insufficiency

of the pleadings confirms their inadequacy. The first allegation, that "on the last

day of Q42004, a large tractor trailer truck full of batteries was shipped

prematurely to a retail customer, only to let it sit in that customer's parking lot for

three days because they refused to accept the product which had been delivered

early" fails to identify the customer, the approximate value of the product, whether

the product was eventually accepted by the customer, or whether it was returned to Spectrum Brands.  The second example, that "in January 2005, Wal-Mart requested the return of $5 million worth of batteries," fails to allege whether Spectrum Brands granted the request to return the batteries, and whether Wal-Mart in the end returned the batteries or kept them  The PSLRA requires more.

Reviewing the allegations as a whole, they do not inform the Court whether the alleged improper return practices were widespread or isolated, whether any of the alleged return requests were granted, whether the returns were completed, whether they typically involved hundreds rather than millions of dollars of product, or whether the alleged de facto return policy affected end-of-quarter sales any differently than it did sales at other times.  Even if Plaintiffs' allegations would otherwise be actionable under the securities laws because Defendants' practices do not comply with GAAP,  Plaintiffs have failed to provide any specific allegations on how refunds or allowances were granted, the number or identity of customers to whom they were granted, when, in what form, and in what amount.

Plaintiffs have failed to allege adequately the who, what, when, where, and how of the context of its fraud allegations tied to improper returns and revenue

recognition.[4]  They fail to meet the pleading requirements of the PSLRA and Rule

9(6) and the Complaint must be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

    2.    *Scienter*

To state a claim for securities fraud under the Exchange Act, a plaintiff must

prove scienter, or an intent to defraud.  The PSLRA requires a securities fraud

complaint, "with respect to each act or omission alleged to violate this chapter, [to]

state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "[T]hose facts

must now present a <u>strong</u> inference of scienter.  A mere reasonable inference is

insufficient to survive a motion to dismiss."  <u>Greebel v. FTP Software, Inc.</u>, 194

F.3d 185, 196 (1st Cir. 1999).  Although factual allegations may be aggregated to

infer scienter, "scienter must be found with respect to each defendant and with

respect to each alleged violation of the statute."  <u>See Phillips v. Scientific-Atlanta,</u>

<u>Inc.</u>, 374 F.3d 1015, 1017-18 (11th Cir. 2004).  "[Section] 10(b) was addressed to

practices that involve some element of scienter and cannot be read to impose

─────────────────

    [4] At most, Plaintiff alleges corporate mismanagement, although it is not
clear that Plaintiffs allegations even reasonably allege this.  <u>See</u> <u>NDCHealth Corp.</u>,
2006 WL 2883238 at *4.  <u>See</u> <u>also</u> <u>Santa Fe Indus. v. Green</u>, 430 U.S. 462, 477
(1977).

liability for negligent conduct alone."  Ernst & Ernst v. Hochfelder, 425 U.S. 185,

201 (1976).  The Eleventh Circuit requires that:

> [T]he plaintiff must allege particular facts giving rise to a
> strong inference that the defendant acted in a severely
> reckless manner.  Severe recklessness is limited to those
> highly unreasonable omissions or misrepresentations that
> involve not merely simple or even inexcusable
> negligence, but an extreme departure from the standards
> of ordinary care, and that present a danger of misleading
> buyers or sellers which is either known to the defendant
> or is so obvious that the defendant must have been aware
> of it.

Theoharous, 256 F.3d at 1225 (quotations and citations omitted).

"In order to comply with the heightened pleading requirement of the

PSLRA, [a] class action complaint must describe how the defendants acted with

severe recklessness in relation to the alleged material misrepresentations and

omissions."  In re Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353, 1371 (S.D.

Fla. 2001).  "Conclusory allegations do not satisfy the pleading requirements of

Rule 9(b) . . . ."  In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 894 (8th Cir.

2002) (quotation and citation omitted).  A complaint alleging securities fraud

"must provide a factual basis for allegations of scienter."  Id.  The PSLRA

demands specific, particularized pleading.  Generally, scienter is not plead

adequately if a plaintiff does not allege sufficient context to raise a strong inference

that relevant information was either obvious or known to a defendant.  Theoharous, 256 F.3d at 1219.  In a channel-stuffing case, failure to plead the factual circumstances of the channel-stuffing precludes Plaintiffs from alleging facts sufficient to raise the required strong inference of scienter.  See NDCHealth, 2006 WL 2883238 at **3-4. (holding no sufficient inference of scienter pled where channel-stuffing allegations not pled with specificity).  See also Theoharous 256 F.3d at 1225 (holding no adequate allegation of scienter where "plaintiffs did not allege the context in which Fong made this statement, [and] it does not appear from the face of the complaint that Fong must have known that the statement presented a danger of misleading buyers or sellers.").  "[A] showing of mere motive and opportunity is insufficient to plead scienter."  Bryant, 187 F.3d at 1287.  GAAP violations, standing alone, are insufficient to give rise to a strong inference of scienter.  Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1208 (11th Cir. 2001); In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999).  The scienter standard is a significant one:

> In order to plead fraudulent accounting practices with particularity, a complaint should show facts that support the inference that the defendants recklessly disregarded the deviance from GAAP or acted with gross indifference to the misrepresentations in its financial statements. Relevant facts are the magnitude of the accounting error,

> whether the defendants had prior notice of the error, and
> whether the defendants played any role in calculating and
> disseminating the financial statement.

In re Scientific-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d 1351, 1366 (N.D. Ga.

2002) (quotation and citation omitted).[5]

Plaintiffs allege that the individual defendants generally knew that their

statements were false or misleading.  Plaintiffs do not offer any direct allegations

of knowledge, nor do they allege the specific circumstances necessary to raise the

strong inference required with respect to each Defendant and each alleged

violation.  Phillips, 374 F.3d at 1017-18.  The Complaint does not identify any

instances in which Edwards or Jones evidenced knowledge of the alleged conduct

or were present for specifically identified meetings or communications in which

channel-stuffing was specifically alleged to have been discussed.  Plaintiffs rely

---

[5] "Thus, in certain circumstances, courts have held that allegations of violations of GAAP, coupled with ignoring 'red flags' or warning signs of improprieties, can be sufficient to state a claim of securities fraud."  In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1302 (S.D. Fla. 2002).  Even in these cases, courts require allegations to show that a defendant was acting with such lack of care that it amounted to severe recklessness.  In the present case, Plaintiffs have failed to articulated the existence or identity of any "red flag" and have not pled the circumstances of the fraud with sufficient particularity to allow the Court to make the inference that Defendants were severely reckless.  There simply is not enough here to raise the required strong inference.

instead on vague circumstantial arguments to support a general speculative conclusion that the Defendants were in a position to have known and thus must have known that their public statements and filings would mislead. This theoretical approach is not sufficient.

Plaintiffs first argue that Jones and Steward had a motive to inflate artificially Spectrum Brands's stock price, and that Steward and Jones by virtue of their authority in the company had the opportunity to do so. (Compl. ¶¶ 94-95.) Next, Plaintiffs argue that stock sales made by Steward and Jones during the class period were suspicious in timing and amount. (Id. ¶ 90.) Finally, Plaintiffs argue that knowledge of the channel-stuffing conduct generally was available to Spectrum Brands, and thus should be imputed to Steward and Jones as senior officers. (Id. ¶¶ 24-27.) These lines of reasoning fail, because, individually and in the aggregate, they are not supported by allegations of particular fact sufficient to support the strong inference required.

Plaintiffs allege that Steward and Jones had both motive and opportunity to engage in securities fraud. Plaintiffs alleges that Steward and Jones were motivated by the large performance-based bonuses they were due to receive if Spectrum Brands demonstrated a certain level of financial performance. (Id. ¶ 94.)

Plaintiffs allege that in 2004, Jones received a performance bonus of $784,000 and Steward of $218,500.   In 2005, Plaintiffs allege that Jones received a bonus of $938,000 and Steward a one of $281,000. (Id. ¶ 95.)  Assuming the truth of Plaintiffs' allegations that these bonuses embodied in part a reward for Spectrum Brands's performance during the Class Period, Plaintiffs have shown that Steward and Jones had an economic motive to inflate sales numbers.

Plaintiffs further allege that Rayovac was engaged in an aggressive program of acquisition, and particularly aimed to acquire United and other companies to diversify its business.  (Id. ¶ 6.)  Plaintiffs allege that because Rayovac was using its own stock as part of the consideration for these acquisitions, Defendants had a strong motive to inflate artificially sales to maintain or increase Rayovac's stock price.  (Id. ¶ 7.)  Plaintiffs allege that the benefits Rayovac would realize from a temporarily high stock price–which would result in a significant de facto discount in the price of the acquired company–provided a further motive for Defendants to inflate sales numbers for present quarters.  (Id. ¶ 102.)  Plaintiffs then allege that, as CEO and CFO, respectively, Jones and Steward had the opportunity to engage in the fraudulent conduct alleged.

Plaintiffs have alleged that Steward and Jones had motive and opportunity to inflate Spectrum Brands's stock price. Motive and opportunity alone, however, are not sufficient to raise a strong inference of scienter. Bryant, 187 F.3d at 1287.

Plaintiffs next allege that Steward sold 60,017 shares of company stock for proceeds of $2,311,650, amounting to 25.54% of his holdings, during the Class Period. (Compl. ¶ 90). Plaintiffs allege that Jones sold 164,350 shares for $6,371,944 during the class period, amounting to 15.05% of his personal holdings during the Class Period. (Id. ¶ 89).[6] Plaintiff does not allege whether either Defendant realized profit on the stock sold. Plaintiffs claim that these sales were suspicious and unusual, and further allege that several of these sales occurred at peaks in Rayovac stock prices and just prior to large drops. (Id. ¶ 92).

"Insider sales may contribute to an inference of scienter where a plaintiff can show that the trading activity was unusual." In re AFC Ent., Inc. Sec. Lit., 348 F.

---

[6] Defendants argue that Steward and Jones were net purchasers of Spectrum Brands stock pursuant to an employee stock plan during the Class Period. (Def. Mot. to Dismiss at 19-20.) Defendants mistakenly argue that this defeats Plaintiffs' allegations of scienter. The Court recognizes that, pursuant to employee stock plans, Steward and Jones may have been able to purchase stock at sub-market rates, and that their ability to sell those stocks may have been restricted. Construing the circumstances in the light most favorable to Plaintiffs, the fact that Steward and Jones bought more Spectrum Brands stock than they sold in this case affects little the scienter analysis.

Supp. 2d 1363, 1374 (N.D. Ga. 2004). Trading is unusual when "it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information." Id. If a sale is made pursuant to a 10b-5 plan, the plan serves as an affirmative defense to allegations of insider trading. A 10b-5 plan is not, however, dispositive on the issue of scienter, which should be evaluated from the aggregate facts alleged.

Steward's stock sales were made on February 2, 2005, May 20, 2005, and May 23, 2005. (Compl. ¶ 94.) According to the Complaint, the "truth" of Spectrum Brand's inflated financial performance was first known to the market on July 28, 2005, when Spectrum Brands announced that "sales would fall woefully short of previous estimates." (Id. at 93.) Plaintiffs infer that because Steward sold a large percentage of his personal holdings at a general peak in the stock price and within temporal proximity to the July 28 announcement, he must have been maximizing his benefit from insider information. The stock sales alleged to be suspicious, however, were made more than two months prior to the July 28 announcement. Steward's largest sale of 30,017 shares for $1,154,154 was made nearly six months prior to the July 28 announcement. The temporal distance between Steward's stock sales and the July 28 disclosure must be considered, and

affect whatever inference of scienter might otherwise be drawn from the sale. In re Park City Sec. Litig., 147 F. Supp.2d 282, 313 (D.N.J. 2001) (holding that any inference of scienter was "defeated" when a stock sale had been made three months prior to a negative announcement). Plaintiffs' allegations of these sales thus provide some support for an inference of scienter, but are not sufficient to establish the strong inference required.

Plaintiffs allege that Jones's stock sales were made on February 25, 2005, March 29, 2005, April 26, 2005, May 4, 2005, May 24, 2005, June, 30, 2005, July 5, 2005, and July 26, 2005. (Compl. ¶ 90.) The last four sales occurred within two months of the July 28, 2005 announcement, and aggregated 75,000 shares. The next-most-recent sale occurred three weeks prior to the July 28 announcement, and the last sale occurred two days prior to the announcement. Plaintiffs allege that Jones realized $1,800,750 on these last three sales. Plaintiffs do not allege that he realized profit on these sales.

Jones's stock sales on their face require closer analysis than Steward's.[7] The pattern of Jones's sales are arguably more unusual than Steward's. Steward sold

---

[7] The Court does not hold, expressly or by implication, that a stock sale must be made with any particular temporal proximity to a negative announcement to contribute to an inference of scienter.

60,017 shares of stock in three transactions.  More than half of Steward's shares were sold in February.  By contrast, Jones sold a large number of shares in February, sold slightly less stock per transaction in March and April, and then sold an increased number of shares with greater frequency in May, June, and July.

Defendants contend that the July 26, 2005, sale was made pursuant to a rule 10b-5 plan, and was thus scheduled months in advance of the July 28, 2005, announcement.  (Def. Mot. to Dismiss at 20-21).  Plaintiffs claim that while Defendant Jones may not have controlled the timing of the sales, he "controlled the timing of when financial results or projections are released to investors" as CEO.  (Pl. Brief in Reply at 32).  The facts are that Jones made three significant sales of stock within the roughly two-month period preceding the July 28, 2005 announcement.  These sales are suspicious.[8]  The sales contribute to an inference of scienter as to Jones, but are not alone sufficient to raise a strong inference that Jones acted with scienter in committing the acts of securities fraud alleged.

_____

[8] This behavior was suspicious enough to draw an investigation from the Department of Justice ("DOJ").  While Defendants have supplemented their briefing to claim that investigation has closed, the letter from the DOJ to Spectrum Brands does not exonerate Defendant Jones from suspicion, and it does not foreclose the possibility that the investigation will be reopened once the facts develop.  Defendants have not argued that the SEC investigation into Jones's stock trading behavior has been resolved.

Despite the timing of the sales and the appearance they create, the pleading shortcoming here is that Plaintiffs have failed to allege with particularity the acts of channel-stuffing that are claimed to render Defendants' statements misleading. Put another way, Plaintiffs must allege sufficient factual context to give rise to a strong inference Defendants acted in a severely reckless manner–that is, that their actions constituted an extreme departure from the standard of ordinary care in making statements that presented  a danger that investors would be mislead. Theoharous v. Fong, 256 F.3d 1219, 1225 (11th Cir. 2001).  In the absence of appropriately pled allegations regarding channel-stuffing, there is no basis for the Court to infer that the individual defendants engaged in insider trading because they knew that their statements were misleading in light of channel-stuffing activities that they participated in, knew of, or that would have been obvious to them.  See NDCHealth Corp. 2006 WL 2883238 at *3 ("the allegations of channel-stuffing in the instant case were not pled with sufficient detail to overcome the PLSRA's scienter hurdle.").  See also Theoharous v. Fong, 256 F.3d 1219, 1225 (11th Cir. 2001) (holding that scienter was not pled with adequate specificity "because the plaintiffs did not allege the context in which Fong made this statement, [and] it does not appear from the face of the complaint that Fong must

have known that the statement presented a danger of misleading buyers or sellers.").  The failure to plead channel-stuffing with requisite particularity precludes Plaintiffs from alleging facts sufficient to support a strong inference of scienter.

Plaintiffs finally allege that, because Stewards and Jones are senior officers, knowledge of the fraudulent behavior should be imputed to them.  Knowledge of facts relating to the core functions of a company can be imputed to a company's key officers.  See In re Friedman's Sec. Lit., 385 F. Supp. 2d 1345, 1363-64 (N.D. Ga. 2005).

Plaintiffs allege that senior officers at Spectrum Brands drove the channel-stuffing efforts.  (Id. ¶ 34.)  Plaintiffs also allege specifically that rebates in excess of 35% or repayment terms of greater than 90 days had to be approved by senior management.  (Id. ¶ 46.)  Plaintiffs allege that Wal-Mart particularly was handled exclusively by senior management.  (Id. ¶¶ 34-36.)

Plaintiffs allege that Spectrum Brands, in general, "had access to systems and reports which detailed how much product SPC customers had on hand.  SPC employed numerous tools to maintain accurate control over its own inventory [and] that of its customers . . ."  (Id.  ¶ 24.)  Plaintiffs further allege that Spectrum Brands

-48-

conducted regular meetings and reporting pertinent to channel-stuffing.  (Id. ¶ 30.)

Plaintiffs' contend that "every Tuesday in the Marketing Conference Room of

Rayovac's old headquarters, in Madison, Wisconsin, Vice Presidents . . . and other

former employees would meet for what was known as a 'Make the Quarter'

meeting."  (Id.)  Plaintiffs claim that Spectrum Brands "generated reports that

displayed an accurate picture of the operational performance" and company

executives were provided with a daily copy of such a report.  (Id. ¶¶ 31-32.)

Plaintiffs specifically allege–although conclusorily–that "Defendant Jones knew in

February 2005 <u>SPC would not make its 2005 earnings numbers because the</u>

<u>channel had been stuffed</u>."  (Id. ¶ 39) (emphasis in original).

   The Court notes again that missing from Plaintiffs allegations are mention of

specific transactions, communications, or events that would show that Steward or

Jones knew of the alleged channel-stuffing conduct or that the conduct would have

been obvious to them.  Plaintiffs do not allege that the channel-stuffing or revenue

recognition policies at issue in this case were specifically discussed in the reports

or meetings.

   There is no allegation regarding what the reports they received showed

concerning the alleged returns, early shipments, or special incentives.  There is a

near-total absence of factual detail regarding what the individual Defendants knew and when they knew it.  The Eleventh Circuit has stated plainly that a "general allegation that Individual Defendants promoted channel-stuffing activities at a series of meetings does not establish scienter." <u>NDCHealth Corp</u>. 2006 WL 2883238 at *6.  Specifically, the Eleventh Circuit held that attending meetings discussing "aggressive discounting and credit terms" and other "broad claim[s] of testimonial evidence" fall short of the specificity required by the PSLRA.  <u>Id.</u> at **5, n.7 - 6.  The types of averment found inadequate to show scienter in <u>NDCHealth</u> are precisely the type offered by Plaintiffs here.

In short, Plaintiffs do not allege facts to show specific transactions in which special returns, credit terms, or other incentives were authorized by the individual defendants, undertaken at their direction, or known or obvious to them, for Wal-Mart or any other customer, in furtherance of a fraudulent channel-stuffing scheme.  Although Steward and Jones should be imputed to possess knowledge of Spectrum Brands's core business, the Court does not find that Plaintiffs have shown facts sufficient to give rise to a strong inference of scienter as to Spectrum Brands generally.  Plaintiffs have failed to plead adequately the circumstances of the fraud claims, particularly the channel-stuffing, return, and revenue recognition

practices about which it alleges Defendants were knowledgeable.  Because Plaintiffs have failed to plead sufficiently the identity of the information it relies on, the Court cannot find that Plaintiffs have raised a strong inference that Defendants knew or were severely reckless regarding that information.

Taking all of Plaintiffs' allegations in the aggregate, the Court finds that Plaintiffs have failed to meet the PSLRA requirement to allege scienter sufficiently.  Steward and Jones's receipt of performance-based bonuses, well-timed stock sales, and senior positions, viewed in the aggregate, weaves an interesting tapestry, and perhaps even raises serious questions about their management and integrity.  Plaintiffs' allegations, however, fail to provide a sufficient basis for the strong inference required by the PSLRA that Steward or Jones knew about or acted with severe recklessness with respect to each statement or omission claimed by Plaintiffs to be fraudulent.  Plaintiffs' scienter allegations may raise suspicions about Steward and Jones, but the PSLRA requires more than mere suspicion.  It requires factually particular pleading sufficient to raise a strong inference of scienter.  See, e.g., NDC Health Corp., 2006 WL 2883238 at **3-6.  This the Plaintiffs have failed to provide.

3.    *Safe Harbor Provisions*

Defendants contend that Plaintiffs' claims should be dismissed because the statements alleged to be false or misleading were forward-looking statements protected by the statutory safe harbors of 15 U.S.C. § 78u-5(c)(1)(A) and (c)(1)(B). (Def. Mot. to Dismiss at 22-24.)

In light of the Court's decision to grant Defendants' Motion to Dismiss for reasons discussed in this Order, and because Plaintiffs' will be permitted to amend their Complaint to correct the pleading deficiencies identified, Defendants' safe-harbor claims are not addressed in this Order.[9]

---

[9] This case presents a unique set of challenges in determining issues whose resolution implicates the facts failed to be sufficiently alleged.  Determining whether a statement contains sufficiently "meaningful" cautionary language and is thus entitled to a PSLRA safe harbor, for example, can be a fact-intensive question inappropriate for decision on the pleadings.  See Ashley v.  Baxter Int'l, Inc., 377 F.3d 727, 734 (7th Cir. 2004) ("There is no reason to think–at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery– that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) "important" sources of variance. The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations. Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projection) were the principal or important risks.").  In a case such as this, where the underlying facts themselves have been pled only vaguely and decision is capable of being reached on other grounds, it is not advisable for the Court to rule on the potentially fact-intensive safe-harbor issue.

-52-

4.   *Control Person Claims*

The Individual Defendants move to dismiss the control person claim under §

20 of the Exchange Act on the basis that Plaintiffs have failed to plead an

underlying violation.  In light of the Court's preceding discussion and findings,

Plaintiffs have failed to plead a § 20 claim.  <u>See</u> <u>Theoharous</u>, 256 F.3d at 1227.

**IV.   CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the Defendants' Motion to Dismiss [21] is

**GRANTED** and Plaintiffs' Consolidated Amended Class Action Complaint [18] is

**DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Spectrum Brands's Motion for Leave to

File a Supplemental Reply Memorandum [33] and Plaintiff Edward Webb's

Motion to Join Consolidated Action [29] are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs are granted leave to file a

Second Amended Complaint, and shall do so within thirty (30) days of entry of this

Order, Defendants shall file their motions to dismiss, if any, within thirty (30) days

of the filing of the Second Amended Complaint.  In filing any further amended

Complaint, Plaintiffs shall provide the Court with a red-line copy of the  Complaint

[18] so that the Court may identify each amendment made to the Complaint.

      **SO ORDERED**, this 27th day of October, 2006.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE